# DEPARTMENT OF PROFESSIONAL REGULATION, BOARD OF MEDICAL EXAMINERS v FURMAN

Case No. 87-0510

State of Florida, Division of Administrative Hearings

November 30, 1987

## APPEARANCES OF COUNSEL

**Julie Gallagher,** Senior Attorney, Department of Professional Regulation for petitioner.

**Irvine K. Furman,** M.D. pro se.

**Charles J. Franson** and **Drew W. Prusiecki** for respondent (appearing post-hearing).

## OPINION OF THE COURT

P. MICHAEL RUFF, Hearing Officer.

### *RECOMMENDED ORDER*

Pursuant to notice, this case came on for hearing before P. Michael

Ruff, duly designated Hearing Officer, on April 29, 1987, in Jacksonville, Florida.

This cause arose upon the filing of an Administrative Complaint on or about January 20, 1987, by the above named Petitioner in which it is alleged that Respondent committed various violations of Chapter 458, *Florida Statutes,* the "Medical Practice Act." Specifically, it is alleged that the Respondent violated § 458.331(1)(m), *Florida Statutes,* by failing to keep written medical records which exemplify justification of the course of treatment of the patient involved, the Respondent's wife. Additionally, it is charged that the Respondent violated § 458.331(1)(q), *Florida Statutes* by allegedly prescribing, dispensing or administering controlled substances in excessive or inappropriate quantities; § 458.331(1)(t), *Florida Statutes* by allegedly failing to practice medicine with that level of care, skill and treatment which is recognized by reasonably prudent, similar physicians as being acceptable under similar conditions and circumstances; and § 458.331(1)(f), *Florida Statutes* by being allegedly unable to practice medicine with reasonable skill and safety due to a mental or physical condition.

The cause came on for hearing as noticed at which the Petitioner presented the testimony of five witnesses and offered four exhibits into evidence, all of which were admitted. The Respondent testified in his own behalf and presented the testimony of two additional witnesses. He offered two exhibits, both of which were admitted into evidence.

Subsequent to the hearing the Respondent retained counsel, Mr. Charles Franson, Esquire, and Mr. Drew W. Prusiecki, Esquire, of Jacksonville, Florida. Upon their appearance in the case, Respondent requested two extensions of time in which to file proposed recommended orders which were agreed to and thus granted. Consequently, proposed recommended orders, as extended, were timely filed. Additionally, the Respondent, through counsel, moved to reopen the record, alleging in essence, that the Respondent was at undue disadvantage as a lay person, not being aware of the substantive and procedural statutes and rules at issue in this formal proceeding and being un-initiated in effective techniques for competent defense of the Petitioner's claim. After consideration of the motion and the response thereto filed by the Petitioner's counsel, and in light of the ample opportunity Respondent had to adequately prepare a defense to charges in the complaint, including opportunity to retain counsel if he desired well prior to hearing, the motion was denied on August 21, 1987. In view of the above circumstances, the time constraints of Rule 28-5-402, Florida Administrative Code have been waived. Those proposed recommended orders have been duly considered and treated in this recommended

**193**

order and are again addressed with specific rulings on proposed findings of fact in the appendix attached hereto and incorporated by reference herein.

The issue to be determined concerns whether the Respondent has violated the provisions of Chapter 458, *Florida Statutes,* as set forth in the administrative complaint, by committing the alleged conduct underlying the charges in the factual allegations of the complaint. If any or all of the charged violations are proven, the issue then becomes what, if any, penalties are warranted under the circumstances.

## FINDINGS OF FACT

The Respondent, Dr. Irvine K. Furman, is a licensed medical doctor having been issued license no. ME0004572. The Petitioner is an agency of the State of Florida charged with enforcing the provisions of Chapter 458, *Florida Statutes* which concern and embody standards by which physicians are licensed in the State of Florida and permitted to maintain licensure and medical practice in the State.

The Respondent received his medical training in the early 1940's and then served in the military services of the United States during and after World War II. Thereafter he worked for a time as a medical examiner and then did a four year surgical residency in Columbia, South Carolina. He came to Florida in approximately 1950 and practiced medicine for a short time in Lake City. He then moved to Jacksonville and entered medical practice, continuing that practice until 1985. Most of his years as a physician have been in the field of general surgery, without about one-third of that practice for a 25 year period in the area of gynecological surgery. He has also practiced surgery extensively in the areas of aorta transplants and artifical joint replacements. He taught surgical residents for many years in area hospitals. During the course of his practice, since approximately 1950, he has always performed any surgery required by his family members and has otherwise treated members of his family, including his wife. Over the years of his practice, he has established an exemplary reputation as a physician and surgeon with his colleagues in the medical profession, even to the extent of being chosen to teach surgery. He was the recipient of numerous accolades from his colleagues upon his departure from active practice in 1985. Prior to the action sub judice, he has been the object of no complaint or proceeding, either formal or informal, by the Department of Professional Regulation, Board of Medical Examiners, or any predecessor agency, nor has any complaint been reported to such agency concerning any aspects of his practice.

On approximately September, 1985, the Respondent suffered a heart attack and underwent related heart by-pass surgery. He still complains of shortness of breath on exertion and his doctor, Scott Baker, M.D., believes that the strain of active surgical practice would be too physically taxing for him at the present time, coupled with his other physical conditions involving allergies, asthma, and previous cancer surgery of the colon. The Respondent indicated that he agrees with the assessment and no longer feels that he can engage in active surgical practice. The Respondent has treated his wife, Lorena or Lori, Furman for many years for various ailments and conditions. In the mid 1950's, she suffered a toxemic pregnancy and, due to the complications associated with that condition, chose to have a therapeutic abortion. While that procedure was being performed, she lost a great deal of blood and the Respondent, (who was not performing the procedure, but was present at the time) due to, apparently, inexperience or uncertainty on the part of the physician in charge of the procedure, stepped in and "packed" her uterus to alleviate the abnormal blood loss. The next day, the uterine pack was mistakenly removed, without the knowledge of the Respondent, which resulted in more blood being lost. After a few additional days in the hospital, Mrs. Furman was discharged and went home. Following this incident, she developed health problems that the Respondent, who was treating her by that time, traced to the abnormal blood loss condition such that he diagnosed her resulting condition as "Sheehan's Syndrome."

Sheehan's Syndrome is a specific disease that occurs secondary to hemorrhage associated with pregnancy. Excessive hemorrhage results in a drop of blood pressure sufficient to decrease profusion, or blood flow, to the anterior pituitary gland which results in the loss of certain essential bodily hormones. This situation occurs because an infarction or damage process to the anterior pituitary gland, due to loss of blood, causes the pituitary to cease functioning or to significantly decrease its functioning level. Thus, the hormones produced by the pituitary gland and the thyroid gland hormones, which are triggered by the action of the pituitary gland, become no longer available to the body. These hormones are not otherwise replaceable by the patient's body.

The normal course of treatment for a true Sheehan's Syndrome condition is to replace the functions lost by the death of, or damage to, the pituitary gland. This treatment would include, but not necessarily be limited to, the provision of sex hormones, steroids, thyroid hormones, adrenaline hormones and, in conjunction with their replacement, the management of the potential side effects of the hormonal therapy. The physician managing a case of true Sheehan's Syndrome

195

would, through the course of treatment, also typically compile voluminous lab work and related records reflecting investigation of steroid levels, serum cortisol levels, ATCH levels, and thyroid stimulating hormone levels.

The Respondent's medical records regarding his wife's care do not reflect this type of treatment pattern. The records rather indicate that various studies were done by other practitioners, but do not reflect that any of them confirmed his diagnosis of Sheehan's Syndrome. The records largely consist of logging of medication and brief summaries regarding his wife's physical condition and changes in her physical condition.

The Petitioner's expert witnesses, Doctors Wilson and Clark, examining the records of Respondent's treatment of his wife, noted the absence of any findings that she had ever suffered shock during the abstetric incident in question. Normally, blood loss would have to occur of a sufficient magnitude to produce the condition of shock in the patient in order for the requisite damage to the pituitary gland to occur so as to result in Sheehan's Syndrome; that is, an essentially total loss of function of the pituitary gland. The medical records in question do not demonstrate evidence of lost hormonal functions in the body which would normally be expected with a dead or severely damaged pituitary gland. The records do not reflect the "replacement therapy" which would be expected and required in order to replace the glandular functions lost. Thus, largely for these reasons, the Petitioner's experts concluded that the Respondent's diagnosis of Sheehan's Syndrome was incorrect.

Both Doctors Wilson and Clark are family practitioners who have practiced in that area in Jacksonville for 17 years and five years respectively. Both are somewhat familiar with toxemic pregnancies and pituitary gland malfunction conditions. The treatment for Sheehan's Syndrome and pituitary gland malfunction is essentially the same. In this connection however, although they opened that the diagnosis was incorrect, these witnesses have never actually diagnosed a case of Sheehan's Syndrome nor experienced treatment of a patient with that syndrome themselves. It is also noteworthy that neither of the witnesses had treated, diagnosed or even seen the Respondent's wife. Consequently, the evidence of the record does not definitively establish whether the Respondent's wife actually suffered from Sheehan's Syndrome.

Regardless of the accuracy of the diagnosis however, it has been established that the Respondent's treatment of his wife was below the

level of care, skill and treatment recognized by reasonably prudent, similar physicians, as acceptable under similar conditions and circumstances, even if she were actually suffering from Sheehan's Syndrome. The generally recognized treatment for that condition involves total hormone replacement which was not shown to have been done in the instant situation. The Respondent did prescribe Premarin, which is a synthetic estrogen, commonly used for post-menopausal hormone replacement. The amount and frequency with which it was given, however indicates that it may have been given only for menopausal replacement rather than as a treatment related to Sheehan's Syndrome. Additionally, that condition is generally recognized to require long term use of steroids, which was not apparently a part of Mrs. Furman's medication plan. The Respondent prescribed thyroid medication which is appropriate with Sheehan's Syndrome since the pituitary gland has ceased functioning and is no longer able to stimulate the production of thyroxen by the thyroid gland. The thyroid medication, in limited amounts, was prescribed, however, without first securing a thyroid evaluation. Instead of total hormone replacement, much of the medication prescribed by the Respondent consists of controlled substances, particularly pain medications.

Between January 21, 1985 and January 21, 1986, the Respondent prescribed the following medications in the following quantities:

| Substance | Quantity |
|---|---|
| Demerol 100 mg. | 405 Ampules (1cc. size) |
| Demerol 100 mg. | 51 Ampules (20cc. size) |
| Demerol 100 mg. | 45 Ampules (2cc. size) |
| Demerol 75 mg. | 29 Ampules (1cc. size) |
| Demerol 50 mg. | 7 vials (30cc. size) |
| Restoril 30 mg. | 2,890 |
| Dolophine 5 mg. | 1,100 |
| PBZ 50 mg. | 30 |
| Butizol 30 mg. | 685 |
| Tenormin 50 mg. | 100 |
| Fiorinal | 30 |

Demerol is a Schedule II controlled substances and is a narcotic pain reliever. Restoril is also a controlled substance used as a tranquilizer to induce sleep. Dolophine is also a controlled substance used as a

**197**

sedative. PBZ is an antihistamine commonly used to treat allergic reactions when a sinus infection is present. Butisol is a controlled substance used as a sedative which has habit forming characteristics. It is sometimes used for control of headaches. Tenormin is a "beta-blocker." Its main purpose is to slow down the heart rate to a certain degree and it is used to treat hypertension, and to alleviate the adverse effects of coronary artery disease. Sometimes it is used to prevent migraine headaches. It is not a controlled substance.

Fiornal is a controlled substance which is a combination of Butisol and aspirin. It has some analgesic action as well as anti-inflammatory benefits. The Demerol, Restoril, Dolophine, Butisol, and Fiorinal prescribed by the Respondents are addictive substances. A physician should be aware of this fact and the Respondent clear was. The Respondent however felt in his exercise of medical judgment that his wife's pain episodes were severe and frequent enough that he had to risk addiction in order to alleviate her suffering, which he felt both professionally and humanely bound to do. Consequently, he exercised a considered decision to risk addiction and then later to attempt to alleviate the addiction, in order to bring some measure of relief, from pain and inability to sleep, for his wife.

Indeed, the Respondent on occasion withdrew all medication in decreasing dosage stages and was able to successfully alleviate her addiction. Thus, it cannot be determined that the Respondent prescribed the controlled addictive substances with any willful or negligent disregard of the addictive consequences. Rather, in the exercise of his medical judgment, he felt it was more appropriate to relief her suffering first and be concerned about curing any resulting dependency as a secondary goal, which he apparently was successfully able to accomplish. Indeed, his wife has been off all medications since September, 1986.

There is no question that the Respondent's efforts at relieving his wife's discomfort by prescribing the controlled substances noted were well-intentioned. Some of those prescribed, and some of the amounts prescribed, were without adequate justification, however. There were insufficient attempts, through testing, reference to appropriate specialists and appropriate consultations with other physicians, to address the causes of his wife's apparent chronic pain. Indeed, Mrs. Furman at times exhibited symptoms which indicate adverse side effects cause by some of these medications, such as cramping, diarrhea, vomiting, and bloody stools. Few apparent attempts were made to evaluate the causes of these symptoms by testing or evaluation by appropriate specialists. The Respondent's approach to treatment of his wife's symptoms and

198

any new symptoms, such as those named above, (which might involve side effects to medications) was often to prescribe additional medication, rather than seek outside consultation in evaluating the cause of the symptoms. In some instances, the amounts of medication, particularly pain relievers, exceeded that which was warranted for the situation at hand. While the medications given were of a type generally appropriate to the symptoms exhibited, in some instances the amounts appear excessive for the situation with which the Respondent was confronted. In many cases, they were not justified because of the Respondent's failure to seek appropriate evaluation of the cause of his wife's symptoms after they persisted for long periods of time in the face of continued administering of the named medications.

The written medical records which the Respondent maintained, although voluminous, fail to adequately justify the course of treatment. They do not reflect repeated evaluation of the persistent symptoms; adequate evaluation and follow-up of the results of medication, either as to effectiveness or side effects; laboratory tests, to monitor the various hormonal levels or objective findings regarding her clinical condition. If anything, his records should have been more complete and adequate in treating his wife, so as to adequately justify his diagnosis and treatment, and to help him guard against the high potential for loss of objectivity risked by any physician treating his wife or a close member of his family. The Respondent's records simply do not adequately justify the course of treatment followed.

The Respondent was examined by a psychiatric expert, Dr. Ernest Miller. His opinion, as well as that of Dr. Wilson, shows that the Respondent had lost his objectivity with regard to treating his wife's ailments. He developed a fixed idea that she suffered from Sheehan's Syndrome and rather doggedly pursued that idea to the exclusion of seeking or acting on other medical opinions or advice. He apparently convinced himself that he was the only physician who understood or was capable of understanding the peculiarities of his wife's condition and of treating her satisfactorily.

The results of the psychiatric examination show that the Respondent had intact cognition and there were no signs to suggest any organic neurological deficits. He was found to be a very skillful physician and surgeon and generally well qualified to practice medicine, except for the finding that he was not capable of objectively treating his wife and had developed the above-mentioned fixation regarding his view of the proper course of treatment for her by himself alone. He also underwent a physical examination by a physician chose by the Petitioner and was found to be well-developed and well-nourished with no acute distress,

well oriented to time, place, person, and situation. His memory for current, recent, and remote events and his motor and sensory systems and strength appeared intact. He does not use alcohol, drugs, narcotics or other chemicals.

There is no question that the Respondent has been very dedicated to his wife's care. It is clear from the evidence however, that he has lost objectivity regarding the handling of his wife's case and ailments and is not able to practice medicine with reasonable skill and safety toward her because of this emotional state. It has not been shown that he is impaired in any way in practicing with reasonable skill and safety toward other patients in his practice within his physical limitations. Some of the Respondent's treatment approaches for his wife were illogical, although well-intentioned. As example, he maintained his wife had an allergy to milk products and yet later had her on a diet which included a great deal of skim milk and eggs, as well as cheese. He maintained that she retained excess fluid as a result of salt intake, and tried to restrict her diet as to salt. At other times, however, he had her on a diet which included products containing significant amounts of salt. In short, the Respondent clearly wanted to care for his wife property, yet he did not deign to consult other physicians about her case. He claimed to only use tests when he wanted to change something in her medication regimen, despite the factual, as opposed to merely interpretive, information that he coul have obtained from appropriate laboratory evaluation, i.e. whether various glands were functioning properly; at what level they were functioning and what the various hormonal levels were. Indeed, in 1963, when an endocrinologist examined Mrs. Furman and found nothing unusual in terms of glandular function and hormonal levels, the Respondent ignored that information and continued "dietary therapy" and heavy administration of medicines.

In summary, it has been demonstrated that the Respondent, through his loss of objectivity, due no doubt to his understandably strong attachment to his wife and concern for her condition, is not capable of practicing medicine with reasonable skill and safety toward her. His physical limitations preclude him from the safe practice of surgery. Indeed the Respondent admits that, due to his heart attack and resultant heart by-pass surgery, with continued shortness of breath upon exertion, that he can no longer undertake the strains of surgical practice. The evidence of record however, does not demonstrate that the Respondent is unable to safely engage in the general practice of medicine with regard to patients other than his wife, so long as he does not engage in surgical practice. It has not been shown that he does not

200

have adequate medical judgment and skill regarding the types of medication and therapies which are appropriate for given conditions or ailments which he might encounter in the general practice of medicine. Because of his loss of objectivity as to his wife's condition, he prescribed medications of a type generally appropriate, although sometimes in excessive amounts, for the conditions he perceived his wife to be suffering. His evaluation techniques were not adequate or were entirely lacking as a basis for his diagnoses and opinions, however. Thus he did not have an adequate diagnostic predicate for prescribing the medications, in many instances.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the parties to and the subject matter of this proceeding, pursuant to § 120.57(1), *Florida Statutes.*

The Petitioner has met its burden of proof regarding the allegations of count one of the administrative complaint. The Petitioner established that the Respondent failed to keep medical records which adequately justified the course of treatment of Mrs. Furman, including, but not limited to, patient history, examination and test results, etc. It has thus been shown, based upon the above findings of fact and the evidence of the record, that the Respondent violated § 458.331(1)(n), *Florida Statutes* (1985) (renumbered as § 458.331(1)(m), *Florida Statutes,* as reenacted by Chapter 86-245, Laws of Florida,) by failing to keep adequate records.

The Petitioner has also established the allegations of count two of the complaint in which it was alleged that the Respondent violated § 458.331(1)(q), *Florida Statutes,* by prescribing, dispensing, administering, mixing or otherwise preparing a legend drug, including any controlled substance, other than in the course of his professional practice. There is a legal presumption under this statute that the prescribing, dispensing, administering or otherwise preparing legend drugs, including controlled substances, inappropriately, or in excessive quantities, is not in the best interest of the patient and is thus without the course of the physician's professional practice. No consideration for the physician's intent regarding such prescribing and administering practices is allowed for in this statutory provision, even though the Respondent's intent during the entire history of his treatment of his wife was obviously laudable. Since the evidence of record and the above findings of fact demonstrate that, to some extent, the medical course prescribed and followed for his wife by the Respondent was inappropriate or in excessive or inappropriate quantities, it must be

201

concluded that the Respondent violated this provision of Chapter 458, F.S.

It has likewise been established that, as alleged in count three, the Respondent violated § 458.331(1)(t), *Florida Statutes,* by failing to practice medicine with that level of. care, skill, and treatment recognized by reasonably prudent, similar physicians as being acceptable under similar conditions and circumstances. This conclusion is based upon the findings of fact which demonstrate that the Respondent lost his capability of objectively treating Mrs. Furman and for this reason only, departed from the level of care, skill, and treatment recognized by prudent similar physicians under the circumstances of Mrs. Furman's case. It has not been established that the Respondent is incapable of or ever failed to practice medicine with the appropriate level of care, skill, and treatment delineated in this statutory provision regarding other patients, nor has it been established, concerning Mrs. Furman or other patients, that he ever engaged in "gross or repeated malpractice."

Finally, it has been proven that, with regard to count four of the complaint, that the Respondent is not able to practice medicine with reasonable skill and safety to patients by reason of a physical condition. The evidence of record, as reflected in the above findings of fact, reveals that the Respondent is simply not physically able to maintain a regular, surgical practice and that, mentally, in terms only of his emotional attachment and loss of objectivity regarding the treatment of his wife, he is not capable of practicing medicine with reasonable skill and safety toward her. Therefore it must be concluded that, in these particulars only, he is in violation of § 458.331(1)(f), *Florida Statutes.*

It is patently obvious that the Respondent has enjoyed a long, dedicated and exemplary career as a physician and surgeon. There is no doubt that he worked relentlessly and very caringly to treat his wife, to teach surgical residents to become good surgeons like himself and to maintain an active and successful surgical practice. Unfortunately, as he himself admits, it is clear that he can no longer continue to practice surgical medicine because of his physical limitations. It is equally clear, because of his emotionally state regarding her condition, related to his relentless, and no doubt emotionally wearing efforts to alleviate her suffering, that he cannot continue to practice medicine in connection with his wife's conditions or ailments.

## RECOMMENDATION

Accordingly, having considered the foregoing Findings of Fact,

Conclusions of Law, the Evidence of Record, the candor and demeanor of the witnesses and the pleadings and arguments of the parties, it is, therefore

RECOMMENDED that the Respondent's medical license be restricted so as to prohibit him from performing any surgery or maintaining a surgical practice of any type and from practicing medicine in connection with his wife or acting as her physician in any way, until such time as he is able to demonstrate to the Board of Medicine that he is mentally and physically capable of practicing medicine with regard to her with reasonable skill and safety. It is, further,

RECOMMENDED that the Respondent, with regard to his continued general practice of medicine be required to forthwith comply with § 458.331(1)(m), *Florida Statutes,* by maintaining at all times adequate, written medical records justifying the course of treatment for all patients, including, but not limited to, patient history, examination results, and test results.

DONE and ORDERED this 30th day of November, 1987, in Tallahassee, Florida.